**John J. MacDONALD, Plaintiff,**

v.

**TANDY CORPORATION, Defendant.**

**No. C. 87–519D.**

United States District Court,
D. New Hampshire.

June 9, 1992.

Andru H. Volinsky, Shaheen, Cappiello, Stein, & Gordon, Concord, N.H., for plaintiff.

Ernest T. Smith, III, Upton Sanders & Smith, Concord, N.H., for defendant.

FRANCIS J. BOYLE, Chief Judge[1].

Plaintiff, John MacDonald brought this wrongful discharge action against defendant, Tandy Corporation. The case was submitted to the jury, which found in favor of Mr. MacDonald. Tandy Corporation moved for judgment *non obstante veredicto* or, in the alternative, for a new trial.

### Facts

On October 1, 1986, John J. MacDonald had been employed by Tandy Corporation (Radio Shack) for almost six years. Mr. MacDonald began his employment as a salesman and thereafter continued as a trainee, manager trainee, store manager and finally trainee. On October 1, 1986, Mr. MacDonald was [working] as a trainee at the Radio Shack store located at the Mall of New Hampshire in Manchester, New Hampshire.

For some time prior to October 1, 1986, Radio Shack was under surveillance by electronically controlled motion detection alarms telephonically monitored by Eastern Alarm at its offices in Portland, Maine. On October 1, 1986, the store had been closed by Tandy employees, David Jesperson, Al Aikens and Shirley Cunningham, at 9:43 p.m. The motion alarms were set at 9:43 p.m. Jesperson, Aikens and Cunningham left the store together at or immediately after 9:43 p.m. and proceeded to the parking lot.

At 9:47 p.m., a motion alarm emanating from the Radio Shack store was received by Eastern Alarm. Eastern Alarm called the Manchester Radio Shack store by telephone but did not receive an answer. At 9:4[9] p.m., a second motion alarm was

1. Of the District of Rhode Island, sitting by designation.

received by Eastern Alarm. Eastern Alarm then called the Manchester Police Department which dispatched a police unit to the store. Eastern Alarm then called the store manager but was unable to reach him. Eastern Alarm then called John MacDonald, the second person on the Radio Shack call list. In response to the call from Eastern Alarm, Mr. MacDonald left his home and went to the Radio Shack store, arriving there at approximately 10:35 p.m.

When Mr. MacDonald arrived, he was met by Mall security personnel and informed that the doors to the store were secure. He was further informed that the Manchester Police Department had also responded and determined that ingress to the store was secure. Mr. MacDonald used a key supplied to him by the store manager, Brad Ackerman, and entered the store alone. He remained alone in the store for approximately 15 minutes. Mr. MacDonald did not observe, either on the evening of October 1, 1986, or the morning of October 2, 1986, when he opened the store, any signs of forced entry, with respect to the rear or front doors or the cash drawers. Mr. MacDonald stated that the "bolt was off when he checked the back door." He also stated that he "did not notice if the cash drawer was open when he went to the store on the night of October 1, 1986."

On the morning of October 2, 1986, Mr. MacDonald discovered $530.02, including $200.00 petty cash, missing from the cash drawer. He immediately notified the store manager, Mr. Ackerman. Mr. MacDonald testified that Mr. Ackerman "told [him] to call the Manchester Police." Mr. Mac-Donald also informed Bill Hanlon, loss prevention manager, of the missing funds.

The police arrived and questioned Mr. MacDonald. Later, both Mr. Ackerman and Mr. Hanlon arrived and began a separate interrogation. They questioned David Jesperson, Al Aikens, Shirley Cunningham and Mr. MacDonald individually. During the questioning of Mr. MacDonald, the subject of taking a polygraph examination was raised. There is disagreement as to who actually brought up the subject. However,

Mr. MacDonald did testify that "I have never from day one tried to say that they forced me into taking a polygraph exam."

Mr. MacDonald, on October 9, 1986, went to the Manchester Police Department for the purpose of taking a polygraph examination with regard to the missing funds. The test was administered by the Manchester Police Department. Officer Anthony Fowler conducted the examination and scored it as a three chart cumulative total of –17 deceptive and two chart cumulative total of –10 deceptive. In substance, the conclusion was that Mr. MacDonald was not telling the truth. Radio Shack personnel were, thereafter, informed of the polygraph results by Mr. MacDonald.

On October 21, 1986, Mr. MacDonald was discharged. The reason for his separation was stated as "failed to clear integrity investigation. See Loss Prevention Report and Manchester, New Hampshire Police Report for details."

Prior to October 1, 1986, Mr. Mac-Donald's position with Radio Shack was not in jeopardy for any reason. Mr. Mac-Donald instituted a wrongful discharge action against Tandy Corporation, claiming that he was fired in violation of public policy. Mr. MacDonald argues that Tandy discharged him for cooperating in its investigation of the missing funds.

The issue of wrongful discharge was submitted to the jury. The jury found in favor of Mr. MacDonald, awarding him $101,000 in damages. Tandy Corporation moved for a judgement n.o.v. or, in the alternative, for a new trial. Since the issues raised in this case presented questions of first impression in New Hampshire, the court reserved decision on defendant's motions and, instead, issued a certification order to the New Hampshire Supreme court, requesting the court to answer the following question:

> Do the facts and circumstances of this action support a finding that public policy encouraged the action of the Plaintiff, or does public policy condemn any action which the Plaintiff refused to take in connection with the termination of his at-will employment by the Defendant?

The New Hampshire Supreme Court returned the certified question to this court unanswered.[2] This court must, therefore, resolve defendant's motions for judgment n.o.v. or a new trial.

The standard for judgment n.o.v. is well established in this jurisdiction. A trial court must view the evidence, and all reasonable inferences which may be drawn therefrom, in the light most favorable to the non-moving party. *Veranda Beach Club v. Western Sur. Co.*, 936 F.2d 1364, 1383–84 (1st Cir.1991). In construing the evidence, the court is not at liberty to make credibility determinations or to evaluate the weight of the evidence. *Id.* "The jury's verdict should only be set aside when the evidence ... is such that reasonable persons could reach but one conclusion." *Id.*

The standard governing new trial motions is also firmly established. A motion for new trial may be granted when the outcome of the trial is against the clear weight of the evidence and a miscarriage of justice would result by upholding the verdict. *Id.*

## DISCUSSION

■ Absent an express or implied contract, it is a well established common law rule that employment for an indefinite period of time is presumed to be at will and terminable by either party with or without cause. *See Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549, 551 (1974). However, New Hampshire recognizes an exception to the common law rule. In *Monge*, the New Hampshire Supreme Court stated that "termination by an employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation ... constitutes a breach of the employment contract." 316 A.2d at 551. This rule was subsequently modified in *Howard v. Dorr Woolen Co.*, 120 N.H. 295, 414 A.2d 1273, 1274 (1980), to include situations where an "employee is discharged because he performed an act

that public policy would encourage, or refused to do that which public policy would condemn." 414 A.2d at 1274.

■ A determination of public policy presents a factual question which must be resolved by the trier of fact. *See Cloutier v. Great Atlantic & Pac. Tea Co.*, 121 N.H. 915, 436 A.2d 1140, 1145 (1981) (determination of public policy involves "multifaceted balancing process properly left to the jury"). There may, however, be instances where the public policy at issue is so clear that its existence may be determined as a matter of law. *Id.*

Although New Hampshire courts have not articulated a specific test for determining public policy, they have indicated that an "employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment and the public's interest in maintaining a proper balance between the two." *Id.* at 1143. In this case, the court must determine whether the plaintiff has presented any facts sufficient to support a determination of public policy to give rise to an action under New Hampshire law.

■ Mr. MacDonald claims that he was fired because he cooperated with his employer investigation of monies stolen from the store at which he worked. The capstone of Mr. MacDonald's argument is that but for him voluntarily taking the polygraph examination, his employer would not have had a reason to terminate his employment. The jury determined that Mr. MacDonald's participation in the investigation did constitute action which the public would encourage and his termination was contrary to public policy. No court has ever determined that cooperation with one's employer constitutes a public policy. In New Hampshire the issue of the existence or non-existence of a public policy is a factual question, and the jury's finding need not be

---

**2.** The issue here is an important state law question. It is unfortunate that the New Hampshire Supreme Court declined to provide this Court with its advice. There is no alternative except to try to predict how that court would have decided this issue had it chosen to do so. The New Hampshire Supreme Court provided no explanation for its failure to determine the issue.

supported by case or statutory law. *See Cloutier,* 436 A.2d at 1142, 1144, 1145.

Jury determination of facts are not to be disturbed unless it is clear from the facts and circumstances that the jury's finding is against the clear weight of the evidence. *O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1072 (1st Cir.1986) (citing *Oxford Shipping Co., Ltd. v. New Hampshire Trading Corp.,* 697 F.2d 1, 5 (1st Cir.1982)). The only evidence submitted on the issue of whether cooperating with one's employer is sanctioned by public policy was the following exchange with Bill Hanlon, Tandy loss prevention manager:

Q. I think Friday you testified that you'd been loss prevention manager for some seven years with Tandy?

A. Right around seven years, yes, sir.

Q. During the seven years (sic) you were called upon to do theft investigations from time to time to time?

A. Yes, sir.

Q. And you already testified on Friday that theft losses affect consumer prices?

A. Yes, they do.

Q. Now, in doing these investigations from time to time was it important, were you more effective if you had the cooperation of the employees involved in the investigation?

A. It would be more effective, yes.

In ruling on a motion for judgment n.o.v. or new trial, the court must consider the evidence, together with any reasonable inferences which may be drawn therefrom, in the light most favorable to the non-moving party. If there is evidence, however slight, from which the jury could have determined the fact in issue, the court is not free to set aside the jury verdict. The jury certainly could have inferred from Mr. Hanlon's testimony that public policy would support an employee's cooperation with his employer in theft investigations. This is not, however, the issue.

To prove wrongful discharge, Mr. MacDonald must show (1) that Tandy Corporation was motivated by bad faith, malice or retaliation in terminating his employ-ment, and (2) that he was discharged because he performed an act that public policy would encourage or refused to do something that public policy would condemn. *Cloutier,* 436 A.2d at 1143, 1145. First, turning to the element of bad faith.

Bad faith has been characterized as the equivalent of malice. *Centronics Corp. v. Genicom Corp.,* 132 N.H. 133, 562 A.2d 187, 191 (1989). This court instructed the jury that in order to prove bad faith the plaintiff had to show that "the defendant's decision to terminate [him] was without reasonable cause or excuse as the facts would have appeared to a reasonable person, and that the termination was willful and intentional; that is, the company knew that the termination was unreasonable and still decided to terminate [his] employment; or that the termination was motivated by ill will or a purpose to harass." *See Betts v. Stroehmann Bros.,* 355 Pa.Super. 195, 512 A.2d 1280, 1281 (1986) (public policy violated where employer did not have legitimate or proper reason for the termination).

Contrary to the jury's findings, there was a legitimate and unquestioned reason for Mr. MacDonald's termination. Mr. MacDonald was fired because he was suspected of stealing money from his employer. Tandy's suspicions were based, in part, on the results of a polygraph examination conducted by the Manchester Police Department and, in part, on the fact of Mr. MacDonald's solo foray into the premises on the evening of October 1, 1986.

While the results of the polygraph examination played a significant role in determining Mr. MacDonald's fate, it was by no means the only factor considered in the decision to terminate his employment. The notation on Mr. MacDonald's personnel record states that he was terminated because he failed to clear an integrity investigation. The record then directs one to the loss prevention report *and* the police report for additional details. Based on its own investigation and the results of the polygraph, Tandy Corporation concluded that Mr. MacDonald most likely stole the money found missing on October 2, 1986. Consequently, Tandy Corporation decided to ter-

minate Mr. MacDonald's employment because he was suspected of stealing from the company, not because he cooperated in Tandy's investigation of the missing funds.

The public policy exception to at will employment discharges does not deprive an employer of the right to make business decisions which are necessary to effectuate the efficient and profitable operation of that business. *Monge*, 316 A.2d at 551–52. Nor does the public policy exception interfere with an employer's ability to hire and retain those individuals best qualified for the job. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505, 510 (1980). Tandy Corporation deemed Mr. MacDonald's employment a liability which was in its best interest to eliminate. Under the circumstances, Mr. MacDonald's termination was not in violation of public policy. *See Beery v. Maryland Medical Laboratory, Inc.*, 89 Md.App. 81, 597 A.2d 516 (1991) (discharge of employee based on unsupported allegations of theft did not violate public policy); *Gillespie v. St. Joseph's University*, 355 Pa.Super. 362, 513 A.2d 471 (1986) (discharge of employee based on suspicion of theft from employer not in violation of public policy).

The jury determined that a public policy exists which encourages employees to cooperate in theft investigations conducted by their employers. Here, Mr. MacDonald claims that he cooperated in the investigation of the stolen money by taking a polygraph test. The real issue is whether Mr. MacDonald was acting in cooperation with an investigation conducted by his employer or by the Manchester Police Department. There is absolutely no evidence that defendant Tandy Corporation demanded, requested, required or arranged for Mr. MacDonald to take the polygraph examination. Officer Fowler testified without contradiction that the polygraph examination was arranged by and administered as part of an investigation conducted by the Manchester Police Department. He further stated that the investigation being conducted by the police was independent of any investigation being conducted by Tandy. Officer Fowler also testified that he did not reveal the results of the polygraph examination to

Tandy Corporation. It was his testimony that Brad Ackerman, Mr. MacDonald's supervisor, telephoned him and told him that he knew the results of the examination. Officer Fowler testified that he simply confirmed Mr. Ackerman's statements regarding the polygraph test results.

Mr. MacDonald's action in taking the polygraph examination was clearly not done in cooperation with an investigation being conducted by his employer but one being conducted by the Manchester Police Department. Hence, the public policy found to exist by the jury is not of any significance to this action. The defendant's motion for judgment n.o.v., thus, must be granted.