Kopf v. Chloride Power                    CV-94-391-SD  01/12/95 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Herbert Kopf

       v.                                    Civil No. 94-391-SD

Chloride Power Electronics, Inc.;
Frederick M. Sturm


O R D E R


     In this civil action, plaintiff Herbert Kopf alleges federal

claims of (1) age discrimination in violation of the Age

Discrimination in Employment Act of 1967 (ADEA), Pub. L. No. 90-

202, 81 Stat. 602 (codified at 29 U.S.C. § 621, et seq. (1985))

and (2) employment discrimination based on disability in

violation of the Americans with Disabilities Act of 1990 (ADA),

Pub. L. No. 101-336, 104 Stat. 327 (codified at 42 U.S.C. §

12101, et seq. (Supp. 1994)), against defendants Chloride Power

Electronics, Inc. (Chloride Power) and Frederick M. Sturm,

general manager of Chloride Systems (Chloride), a division of

Chloride Power.

     In addition to his federal claims, Kopf alleges state-law

claims of (1) wrongful termination; (2) intentional infliction of

emotional distress; and (3) defamation against defendant Chloride

Power and state-law claims of (1) intentional infliction of emotional distress; (2) intentional interference with contractual relations; and (3) defamation against defendant Sturm.

The court has jurisdiction over these matters due to the federal questions at issue, 28 U.S.C. §§ 1331, 1343(a)(4), which extends to the supplemental state-law issues as well, 28 U.S.C. § 1367.

Presently before the court are defendant Chloride Power's motion to dismiss pursuant to Rules 12(b)(3) and 12(b)(6), Fed. R. Civ. P., and defendant Sturm's motion to dismiss pursuant to Rule 12(b)(2), Fed. R. Civ. P. Plaintiff objects to both motions.

## Background

Kopf was hired by Chloride, an emergency lighting systems manufacturer, in February of 1991 at the age of 56. Working from an office in his home in Amherst, New Hampshire, Kopf served as the regional sales manager for the Northeast, one of Chloride's four sales regions.[1] Kopf's territory was subsequently expanded to include Ohio and Michigan.

On October 18, 1992, Kopf fell off a ladder at home and

---

[1]The court notes that Chloride's sales regions have been reorganized since the time of Kopf's termination, with the same territory now encompassing a total of seven regions.

suffered an injury which was ultimately diagnosed on December 9, 1992, as a hematoma of the brain. After surgery on December 16, 1992, Kopf's work day was limited to approximately one hour per day. His doctor, however, advised that longer hours would eventually be allowed as Kopf progressed to full recovery--an estimated six-month period of time. Despite his recent medical treatments and evaluation, Kopf received disciplinary letters on December 10, 1992, and February 9, 1993, indicating Chloride's dissatisfaction with his level of performance. The February 9 letter established sales quotas for February which had to be achieved in order for Kopf to maintain his position at Chloride.

Kopf sought a meeting with Bill Powell, Chloride's national sales manager, to discuss the performance goals set out in the February 9, 1993, disciplinary letter. This meeting took place at Powell's hotel in Washington, D.C., where Powell was attending a trade show on behalf of Chloride.[2] Powell informed Kopf that he would probably meet the letter's performance goals. However, on February 18, 1993, while Kopf was on a business trip in

---

[2] The parties dispute the significance of this meeting between Kopf and Powell. Chloride Power asserts that Kopf was directed by Sturm to refrain from meeting with Powell at the trade show in Washington, D.C. Conversely, Kopf maintains that Sturm's directive was a prohibition against Kopf's attending the trade show as a Chloride representative (according to his pre-existing arrangements), not a blanket exclusion from meeting with Powell.

Connecticut, he received a notice via facsimile of his immediate termination due to alleged insubordination in meeting with Powell at the trade show.

Within two months of his termination from Chloride, Kopf found employment as the eastern United States sales manager of Siltron, an emergency light and back-up systems manufacturer.

## Procedural History

As a result of perceived age and disability discrimination, Kopf filed a complaint with the New Hampshire Commission for Human Rights and the Equal Employment Opportunity Commission (EEOC) on August 13, 1993.  In December 1993, while Kopf's complaint was still under investigation by the EEOC, Chloride Power filed suit against Kopf in North Carolina Superior Court alleging breach of a noncompetition agreement, which Kopf signed as a condition of employment with Chloride, and interference with contractual relations.

The EEOC issued a right-to-sue letter on April 28, 1994, and Kopf commenced the instant federal action on July 22, 1994.

<u>Discussion</u>

1. <u>Chloride Power</u>

    a. <u>Improper Venue</u>

Chloride Power asserts that "New Hampshire is not the proper venue for this action . . . because the counts should be brought as compulsory claims in the North Carolina action pursuant to Rule 13(a) of the North Carolina Rules of Civil Procedure." Defendant Chloride Power's Motion to Dismiss Pursuant to Rules 12(b)(3) and 12(b)(6) at 4 (citation omitted) (Chloride Power's Motion to Dismiss).[3]  Kopf asserts that his ADEA and ADA claims

_____

[3]Rule 13(a) provides as follows:

> **Compulsory Counterclaims.**  A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

Since Chloride concedes that "Rule 13(a) is the same in both the Federal and the North Carolina Rules of Civil Procedure" and further notes that "interpretation of Rule 13(a) by the North

were not compulsory counterclaims to the North Carolina action as they did not arise out of "the transaction or occurrence" that forms the basis for Chloride Power's North Carolina action.

Despite the generous interpretation afforded to the "transaction or occurrence" standard of Rule 13(a), "even the most liberal construction of the provision cannot operate to make a counterclaim that arises out of an entirely different or independent transaction or occurrence compulsory under Rule 13(a)." 6 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1410 (1990). In determining whether plaintiff's present claims should have been more appropriately brought as compulsory counterclaims to Chloride Power's North Carolina suit, the court is keenly aware that "there is no formalistic test to determine whether suits are logically related," Burlington Northern Ry. Co. v. Strong, 907 F.2d 707, 711 (7th Cir. 1990), the predominant touchstone to the "transaction or occurrence" test. See, e.g., Adam v. Jacobs, 950 F.2d 89, 92 (2d Cir. 1991) ("test for determining whether a counterclaim is compulsory is whether a logical relationship exists between the claim and the counterclaim and whether the essential facts of the claims are so

Carolina courts is 'no different than the interpretation' of the Rule 'by numerous federal courts,'" Chloride Power's Motion to Dismiss at 5, this court will construe federal cases as providing the proper rules of decision relevant to the instant matter.

logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit") (internal quotations omitted) (citations omitted).

In order to determine whether a claim is compulsory, therefore, "[a] court should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." Strong, supra, 907 F.2d at 711-12 (footnote omitted). In light of this standard, the court now turns to the particulars of the respective civil actions.

Chloride Power's North Carolina suit is based on Kopf's alleged breach of his noncompetition agreement and interference with contractual relations between Chloride and its exclusive customers. Chloride Power alleges that Kopf took employment with one of Chloride's business competitors prior to the expiration of the six-month noncompete period and has since attempted to establish business relations with a certain number of customers in Chloride's eastern United States sales region. Kopf's subsequent employment thus "is one of the links in the chain which constitutes the transaction upon which [Chloride Power] bases its cause of action." Moore v. New York Cotton Exch., 270 U.S. 593, 610 (1926). The question to be resolved by this court, however, is whether such subsequent employment "is an important

7

part of the transaction constituting the subject-matter of" the claims that make up the present action.  Id.  Put differently, the question presented is whether Kopf's subsequent employment "is the one circumstance without which neither party would have found it necessary to seek relief."  Id.

In the opinion of this court, both questions must be answered in the negative.  To begin, it is axiomatic that whatever employment Kopf found subsequent to his termination from Chloride would do nothing to vitiate the alleged discriminatory activities of the present defendants.  Moreover, it is precisely as a result of his termination that Kopf seeks the present relief, whereas Chloride Power's claim for relief springs from his subsequent employment, an entirely different "transaction or occurrence."  As the court now finds that Kopf's present complaint is not a compulsory counterclaim to the North Carolina action,[4] Chloride Power's motion to dismiss on that ground must be and herewith is denied.

---

[4]Due to the ultimate resolution of the compulsory counterclaim issue, the court does not reach, and therefore makes no comment upon, the merits of plaintiff's alternative arguments.

b. Motion to Dismiss Counts III and IV

(1) Rule 12(b)(6) Standard

When ruling on a motion to dismiss, it is well established that the factual averments contained in the complaint are to be taken as true, and the court should "indulg[e] every reasonable inference helpful to the plaintiff's cause." Garita Hotel Ltd. Partnership v. Ponce Fed. Bank F.S.B., 958 F.2d 15, 17 (1st Cir. 1992); see also Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989). Whether a motion to dismiss will be successful is not dependent upon the likelihood of success on the merits, but rather upon whether the plaintiff is entitled to offer evidence to support his claim. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Thus, a dismissal for failure to state a claim should be granted "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." Garita, supra, 958 F.2d at 17 (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

(2) Count III - Wrongful Termination

In Count III of his complaint, Kopf alleges wrongful termination against Chloride Power. Complaint ¶¶ 70-77. Under New Hampshire law, in order to establish a claim for wrongful termination an employee must establish two elements: "one, that

the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn." Short v. School Admin. Unit No. 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992) (citing Cloutier v. A & P Tea Co., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981)); see also MacDonald v. Tandy Corp., 796 F. Supp. 623, 626 (D.N.H. 1992). Although the existence or nonexistence of a public policy is ordinarily a question of fact for a jury, the court may, when appropriate, rule as a matter of law whether a public policy does or does not exist. Short, supra, 136 N.H. at 84, 612 A.2d at 370. See also Bourque v. Town of Bow, 736 F. Supp. 398, 402 (D.N.H. 1990) ("'[w]here it is clear that plaintiff cannot articulate an expression of public policy as a matter of law, there is no fact question for the jury to decide'") (quoting Mellitt v. Schrafft Candy Co., No. 80-513-D, slip op. (D.N.H. Dec. 21, 1981), aff'd without opinion, 685 F.2d 421 (1st Cir. 1982)).

In the complaint, Kopf alleges that Chloride's general manager, Sturm, "complained about his aging regional sales managers, and specifically stated that they were 'past their prime.'" Complaint ¶ 25. Kopf further alleges that "Sturm

10

complained to Powell about Kopf's forgetfulness and told Powell to get rid of Kopf and to document it any way that he needed to." Id. ¶ 28. Noting that "[p]ublic policy favors the continued employment of qualified employees, despite age or disability, on equal terms with other employees," Kopf contends that Sturm, "acting within the scope of his employment with Chloride Power, [nevertheless], terminated Kopf out of malice or bad faith in retaliation for Kopf's attempt to return to work rather than resign or retire." Id. ¶ 75.[5]

The courts of New Hampshire have not sanctioned any specific test for making the public policy determination. MacDonald, supra, 796 F. Supp. at 626. However, the New Hampshire Supreme Court has indicated that an "'employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two' . . . ." Cloutier, supra, 121 N.H. at 920, 436 A.2d at 1143 (quoting Monge v. Beebe Rubber Co., 114 N.H. 130, 136, 316 A.2d

_____

[5]In his brief on the issue, Kopf further identifies two specific acts he performed that are encouraged by public policy: "1) defying his employer's attempts to force him to resign due to age and disability; and 2) actively struggling to meet his job requirements despite his disability, and to save his job by meeting with his supervisor." Objection to Chloride's Motion to Dismiss at 18.

11

549, 551 (1974)).  Although "[p]ublic policy exceptions giving rise to wrongful discharge actions may [] be based on [either statutory or] non-statutory policies," id. at 922, 436 A.2d at 1144, "'unless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause,'" id. at 920, 436 A.2d at 1143 (quoting Pierce v. Ortho Pharmaceutical Corp., 417 A.2d 505, 512 (N.J. 1980)).  For at least the past fifteen years, New Hampshire courts have indicated that disability or age are not acts that an employee performs or refuses to perform[6] and thus fail to meet the public policy benchmark.  See Howard v. Dorr Woolen Co., 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980).[7]

The court finds and rules that plaintiff's stated public policy goals are without merit.  The court further finds said

---

[6]Kopf's attempt to recast his claim in terms of action rather than status, see Objection to Chloride's Motion to Dismiss at 18, though novel, is unavailing.  Age and disability comprise the very core of Kopf's ADEA and ADA claims, and will not be disregarded in an effort to maintain the viability of the wrongful termination claim.

[7]Such a common-law infirmity notwithstanding, the Howard court went on to note that the "proper remedy for an action for unlawful age discrimination is provided for by statute," and likewise a disability discharge "is generally remedied by medical insurance or disability provisions in an employment contract." Howard, supra, 120 N.H. at 297, 414 A.2d at 1274 (citing state and federal statutes).  Thus, plaintiff's federal civil rights claims remain unaffected by the court's ultimate ruling.

12

policy goals to be fundamentally insufficient as a matter of law. In consequence thereof, defendant Chloride Power's motion to dismiss Count III (wrongful termination) must be and herewith is granted.

### (3) Count IV - Intentional Infliction of Emotional Distress

In Count IV of the complaint, Kopf alleges that "Sturm and Chloride Power were aware that severe emotional distress was substantially certain to result from their conduct, and their conduct did in fact, cause [] severe emotional distress." Complaint ¶ 81.[8] Chloride Power, however, contends that "[b]ased on well-settled law, Count IV for intentional infliction of emotional distress . . . [is] barred by the New Hampshire Workers' Compensation Law." Chloride Power's Motion to Dismiss at 13-14.

New Hampshire's workers' compensation law contains an

---

[8]According to Kopf's complaint, such emotional distress exhibited itself in the form of "upset and outrage over his termination, and over the way he had been treated by Sturm and Chloride Systems." Complaint ¶ 52. "Kopf felt extremely anxious over whether he, at age 57 and disabled, would be able to find another job or obtain insurance." Id. Kopf further alleges that "[a]s a result of his termination by Sturm and Chloride Power, [he] has suffered, and will continue to suffer, severe emotional distress, lost income, lost benefits and out-of-pocket expenses." Complaint ¶ 55.

13

"exclusivity" provision which provides, in pertinent part, as follows:

> I.  An employee of an employer subject to this chapter shall be conclusively presumed to have accepted the provisions of this chapter and, on behalf of the employee or the employee's personal or legal representatives, to have waived all rights of action whether at common law or by statute or otherwise:
> (a) Against the employer or the employer's insurance carrier or an association or group providing self-insurance to a number of employers . . . .

New Hampshire Revised Statutes Annotated (RSA) 281-A:8 (1987 & Supp. 1993).[9]  According to RSA 281-A:2, XI, "injury" or "personal injury", as outlined in the workers' compensation laws, "means accidental injury or death arising out of and in the course of employment . . . [and] shall not include diseases or death resulting from stress without physical manifestation."  The question presently before the court is whether plaintiff's tort claim for intentional infliction of emotional distress falls within the personal injury definition and is therefore barred by operation of the "exclusivity" provision of RSA 281-A:8.[10]

---

[9]The court notes that paragraph I was technically amended effective January 1, 1994, wherein the Legislature inserted "or provided under the laws of any other state" following "statute" in the introductory paragraph.

[10]The court pauses at this point to note that both parties appended several exhibits to their respective motions and objections thereto.  Owing to the preliminary posture of the

14

Plaintiff maintains that his emotional distress did not "aris[e] out of [or] in the course of employment," RSA 281-A:2, XI, since "[i]njuries flowing from termination . . . by definition begin when employment ends," Objection to Chloride's Motion to Dismiss at 21. However, as this court has previously noted, "'[d]ischarge and concomitant termination of benefits are clearly hazards of employment.'" Restel v. Summa Four, Inc., No. 90-384-D, slip op. at 6 (D.N.H. Oct. 10, 1991) (quoting Dyment v. Elektrisola, Inc., No. 86-372-D, slip op. at 15 (D.N.H. May 26, 1987)) (emphasis added); see also Esco Corp. v. Indus. Comm'n, 523 N.E.2d 589, 592 (Ill. App. Ct. 1988) ("The term 'employment' includes a reasonable time before or after actual employment.").

In order to take his claim outside of the workers' compensation scheme, and thus maintain the viability of his common-law action for emotional distress, plaintiff seeks to disprove the causal relation between the alleged emotional injury and its precipitating event, his termination from Chloride. The employment relationship, however, has both positive and negative attributes. One such negative attribute is the spectre of discharge or termination. Although the relationship between

---

current motion, the court has limited its inquiry to the matters as pled and briefed by the parties, leaving consideration of the supplemental materials to a more appropriate motion.

15

employer and employee is severed upon an employee's termination, the harms of emotional distress and other related injuries which may spring from such termination clearly arise out of "the course of employment"--a phrase which necessarily contemplates and includes an employee's termination.  The court therefore finds that employment and discharge are uniquely intertwined.  Although it may constitute a polar extreme, discharge, regrettably or not, forms one of the many experiences an employee may encounter along his "course of employment."  Consequently, the court further finds and rules that the tort of intentional infliction of emotional distress occasioned solely by reason of discharge falls within the statutory definition of "personal injury" arising out of the employment relationship.

Once this threshold has been surmounted, the remainder of the court's analysis is relatively straightforward.  The federal courts of this circuit have addressed the ramifications of the "exclusivity" provision on at least four separate occasions,[11] collectively producing the unified and unequivocal response that RSA 281-A:8 bars an employee's common-law action for personal

---

[11]That being said, until today's ruling, no court has ever specifically explained <u>why</u> common law actions sounding in emotional distress are precluded by the "exclusivity" provision, finding justice well served in simply deeming such claims barred by RSA 281-A:8.

16

injuries, including the intentional infliction of emotional distress arising out of an employment relationship. See, e.g., Censullo v. Brenka Video, Inc., 989 F.2d 40, 43 (1st Cir. 1993) ("Emotional distress is a personal injury, not subject to recovery in a common law action under state workmen's compensation statute."); Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1187 n.3 (D.N.H. 1992) ("Defendants argue that RSA 281-A:8 . . . bars any claims plaintiff may have against [defendants] for damages as the result of personal injuries. The court agrees."); Bourque, supra, 736 F. Supp. at 404 ("[P]laintiff's claims for personal injuries arising from his allegedly wrongful discharge, including permanent physical and psychological damage and emotional distress, are barred by N.H. RSA [281-A:8]."); Brewer v. K.W. Thompson Tool Co., 647 F. Supp. 1562, 1566 (D.N.H. 1986) (noting "distinction between actions intentionally taken and injury intentionally caused" and indicating that injuries caused by the former constitute "accidental injuries" for which recovery is barred pursuant to RSA 281-A:8). Accord O'Keefe v. Associated Grocers, Inc., 120 N.H. 834, 835-36, 424 A.2d 199, 201 (1980) (RSA 281:12, precursor to RSA 281-A:8, "clearly prohibits an employee from maintaining a common-law action against his employer for personal injuries arising out of the employment relationship.").

As a result of the bar occasioned by operation of RSA 281-A:8, Chloride Power's motion to dismiss plaintiff's claim for

intentional infliction of emotional distress (Count IV) must be and herewith is granted.[12]

## 2.  Frederick M. Sturm

Sturm, general manager of Chloride and a resident of North Carolina, moves to dismiss the instant action based on lack of personal jurisdiction.  In order for this court to assert personal jurisdiction over Sturm individually, the dual requirements of a state long-arm statute with appropriate reach and comportment with the strictures of due process must be accommodated.  See, e.g., Pritzker v. Yari, Nos. 93-2374, 94-1128, 94-1129, ___ F.3d ___, ___, 1994 U.S. App. LEXIS 35101, at *12 (1st Cir. Dec. 13, 1994); Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994).  Sturm alleges that, under the record as it now stands, Kopf is unable to satisfy either prong of the jurisdictional standard.

### a.  the Applicable Principles

In what is now well-settled law, when a court's personal jurisdiction over a defendant is contested, plaintiff bears the

---

[12]By the same token, the court's ruling leaves unaffected plaintiff's claims for economic injuries such as lost income or benefits as a result of the termination.  RSA 281-A:8 does not present a bar to the pursuit of claims of said character.  See Godfrey, supra, 794 F. Supp. at 1187 n.8; see also Brewer, supra, 647 F. Supp. at 1565 (construing RSA 281:12, precursor to RSA 281-A:8).

18

burden of demonstrating that such jurisdiction exists.  Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992); Ealing Corp. v. Harrods, Ltd., 790 F.2d 978, 979 (1st Cir. 1986) (citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)).  However, when there has been no evidentiary hearing and the court chooses to proceed upon the written submissions, plaintiff need only make a prima facie showing that jurisdiction exists.  United Elec. Workers v. 163 Pleasant Street Corp., 987 F.2d 39, 43 (1st Cir. 1993); see also Boit, supra, 967 F.2d at 675; Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 8 (1st Cir. 1986) (citation omitted).

Although plaintiff's "written allegations of jurisdictional facts are construed in [his] favor," VDI Technologies v. Price, 781 F. Supp. 85, 87 (D.N.H. 1991) (citing Kowalski, supra, 787 F.2d at 9), the prima facie showing of personal jurisdiction "must be based on evidence of specific facts set forth in the record," Boit, supra, 967 F.2d at 675 (citing Kowalski, supra, 787 F.2d at 9).  The court, in reviewing the record before it, "'may consider pleadings, affidavits, and other evidentiary materials without converting the motion to dismiss to a motion for summary judgment.'"  VDI Technologies, supra, 781 F. Supp. at 87 (quoting Lex Computer & Mgmt. Corp. v. Eslinger & Pelton, P.C., 676 F. Supp. 399, 402 (D.N.H. 1987) (citation omitted)); see also 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

19

PROCEDURE: CIVIL 2D § 1364 (1990).


    b.  New Hampshire's Long Arm Statute

    New Hampshire's long-arm statute, RSA 510:4, I, dictates

when a nonresident defendant is subject to personal jurisdiction

in New Hampshire.  The statute provides as follows:

> I.  JURISDICTION.  Any person who is not an
> inhabitant of this state and who, in person
> or through an agent, transacts any business
> within this state, commits a tortious act
> within this state, or has the ownership, use,
> or possession of any real or personal
> property situated in this state submits
> himself, or his personal representative, to
> the jurisdiction of the courts of this state
> as to any cause of action arising from or
> growing out of the acts enumerated above.

RSA 510:4, I (1983).  The New Hampshire Supreme Court has

determined that the scope of RSA 510:4 is as broad as is

consistent with the statutory language and the dictates of due

process.  See Phelps v. Kingston, 130 N.H. 166, 171, 536 A.2d

740, 742 (1987) (RSA 510:4 provides jurisdiction "to the full

extent that the statutory language and due process will allow.");

see also Estabrook v. Wetmore, 129 N.H. 520, 522, 529 A.2d 956,

958 (1987); Keeton v. Hustler Magazine, Inc., 682 F.2d 33, 33

(1st Cir. 1982), rev'd on other grounds 465 U.S. 770 (1984) (RSA

510:4 seeks "to extend jurisdiction over nonresidents to the

fullest extent permitted under the federal constitution").

    Kopf alleges, inter alia, that defendant Sturm tortiously

20

interfered with the contractual relations existing between Chloride and himself (Count V). "'It is settled New Hampshire law that a party commits, for jurisdictional purposes, a tortious act within the state when injury occurs in New Hampshire even if the injury is the result of acts outside the state.'" VDI Technologies, supra, 781 F. Supp. at 89 (quoting Hugel v. McNell, 886 F.2d 1, 3 (1st Cir. 1989), cert. denied, 494 U.S. 1079 (1990)) (citations omitted). As further established by the New Hampshire Supreme Court,

> RSA 510:4 subjects a non-resident defendant, whose out-of-State conduct has allegedly resulted in a tort in New Hampshire, to the jurisdiction of the New Hampshire courts when the impact in New Hampshire of the out-of-State conduct was more than fortuitous, so that the defendant knew or should have known his conduct could injure a person here.

Estabrook, supra, 129 N.H. at 523, 529 A.2d at 958.

"In order to bring a claim for tortious interference [with contractual relations], the plaintiff must show that he had a contractual relationship with [Chloride] of which [Sturm] was aware; that [Sturm] wrongfully induced [Chloride] to breach that contract; and that the damages claimed were proximately caused by that interference." Roberts v. General Motors Corp., 138 N.H. 532, 539, 643 A.2d 956, 960-61 (1994); Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46, 534 A.2d 706, 709 (1987).

Kopf, a New Hampshire resident, alleges that in February of 1991, Jerry Davis, Chloride's then-national sales manager, hired

21

Kopf to work as one of Chloride's four regional sales managers. Affidavit of Herbert Kopf ¶ 2 (Kopf Affidavit) (attached to Plaintiff's Objection to Defendant Sturm's Motion to Dismiss). Kopf worked out of an office in his Amherst, New Hampshire, home, with "[c]ommunication to and from the home office[13] [occurring] primarily through telephone calls and written communications." Id. ¶ 3.

From May 1992, when Davis left Chloride, to October 1992, when Bill Powell, a former regional sales manager, was promoted, Sturm performed the duties of national sales manager. Id. ¶ 5. "During this six-month period, Sturm's primary method of communicating with [Kopf] was by sending faxes and calling [him] at [his] office in New Hampshire." Id. ¶ 6.

Further, as Kopf sets forth in his affidavit,

> 7. Powell has told me that after he was promoted to national sales manager, Sturm expressed his displeasure with the ages of the regional sales managers, specifically stating that they were "past their prime."
> . . . .
> 9. According to Powell, after my injury, Sturm complained to Powell about my forgetfulness. Powell told Sturm that I was not myself. Sturm told Powell to get rid of me and to document it anyway that he wanted.
> 10. On December 7, 1992, I sought medical attention, because my condition had worsened to the point that I was partially paralyzed

_____

[13]The court notes that at all times relevant to the present inquiry, Chloride's "home office" has been located in Burgaw, North Carolina. Affidavit of Frederick M. Sturm ¶ 3 (attached to Sturm's Motion to Dismiss).

22

and had difficulty walking. The very next day, I received "disciplinary warning" letter from Powell, stating that I had to improve my recent job performance by the end of January, 1993, or face discharge.

11. Powell has told me that he didn't write the letter, and that Sturm directed him to send it. He also told me that it was company policy to provide two warning letters before terminating an employee.

. . . .

14. According to Powell, around [January], Sturm and Powell discussed the fact that I would only be able to work a limited schedule for the immediate future. Sturm responded by stating that it was a personal problem, and that he had a business to run. When Powell suggested that they let the surgery run its course, and that they could cover for me until I fully recovered, Sturm said that that was not good enough.

15. Notwithstanding that I had only worked a few hours since the December disciplinary letter, on February 3, 1993, I was sent a second disciplinary letter complaining that my performance had not improved since the last letter. The letter, which I did not receive until February 9, also set forth performance goals that I would be required to achieve in February, 1993 in order to keep my job. Powell has told me that Sturm directed him to send this letter, even though Powell told Sturm that it was not a legitimate warning letter.

. . . .

17. On February 10, 1993, I requested a meeting with Powell regarding the second disciplinary letter. Powell agreed to meet with me in Washington, D.C. Powell told me that Sturm was aware that he had agreed to meet with me in Washington, D.C. During the meeting, Powell told me that sales had improved in my region, and that I would probably reach the quota set out in the February disciplinary letter.

18. On February 18, 1993, while I was on a business trip, an employee of the hotel where I was staying handed me a fax from Sturm and

23

>             said "Sorry, bad news."  The fax said I was
>             fired for insubordination for meeting with
>             Powell in Washington, D.C. without
>             permission.

Kopf Affidavit ¶¶ 7, 9-11, 14-15, 17-18.

On the basis of the evidence before it, the court finds that plaintiff has sufficiently pled a cause of action sounding in tort--namely, intentional interference with contractual relations.  Irrespective of plaintiff's presence in another forum when his termination notice was received, the court finds and rules that the practical impact of Sturm's alleged tortious conduct occurred in New Hampshire.  In that New Hampshire was both plaintiff's domicile and his base of operations while he was employed by Chloride, the court further finds that Sturm knew or should have known that his conduct would injure plaintiff in New Hampshire and that such contact with the forum was "more than fortuitous."  As a result, the court's exercise of personal jurisdiction is authorized by and in compliance with the dictates of RSA 510:4, I.

c.  Due Process

"[A] party wishing to validate a court's jurisdiction must show that 'minimum contacts' exist between the defendant and the forum state."  Ticketmaster, supra, 26 F.3d at 206 (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). "The inquiry into minimum contacts is [] highly idiosyncratic,

24

involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case." Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *14. The First Circuit, perhaps sagaciously, has further limned that "[d]ivining personal jurisdiction is 'more an art than a science.'" Ticketmaster, supra, 26 F.3d at 206 (quoting Donatelli v. National Hockey League, 893 F.2d 459, 468 n.7 (1st Cir. 1990)) (footnote omitted).

The First Circuit, acknowledging the amorphous quality of the jurisdictional standard, has developed the following tripartite analysis

> [t]o sharpen the logic of the personal jurisdiction inquiry . . .:
>   First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.[14]

---

[14]In the realm of personal jurisdiction, a court's exercise is "reasonable" so long as it is consistent with the notions of "fair play and substantial justice." International Shoe, supra, 326 U.S. at 320. Recognizing that "'fair play' and 'substantial justice' are not the most self-defining of legal formulations," Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *26, a five-factor gestalt analysis has developed. See infra part 2.c.(3) (identifying and applying gestalt factors).

25

<u>Pritzker</u>, <u>supra</u>, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *14-15.


### (1) Relatedness

"[T]he relatedness test is, relatively speaking, a flexible, relaxed standard," <u>Pritzker</u>, <u>supra</u>, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *15, focusing on "the nexus between the defendant's contacts and the plaintiff's cause of action," <u>Ticketmaster</u>, <u>supra</u>, 26 F.3d at 206. "[T]he relatedness requirement . . . authorizes the court to take into account the strength (or weakness) of the plaintiff's relatedness showing in passing upon the fundamental fairness of allowing the suit to proceed." <u>Id.</u> at 207. Based on the evidence before it, it is apodictic to this court that Sturm's alleged forum-related activity comprises the source and substance of Kopf's cause of action. The court, therefore, finds and rules that plaintiff has made a prima facie showing of relatedness.


### (2) Purposeful Availment

The purposeful availment prong of the jurisdictional inquiry is not an arithmetic endeavor, but rather one of weight and merit. <u>See</u>, <u>e.g.</u>, <u>Pritzker</u>, <u>supra</u>, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *16-17 ("[I]n order to be subject to the jurisdiction of the forum state, a nonresident need have only one

contact with the forum, so long as the contact is meaningful." (citing McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957))). Furthermore, any inquiry into a defendant's "purposeful availment" of the forum must entertain the dual cornerstones of purposeful availment--foreseeability and voluntariness. Ticketmaster, supra, 26 F.3d at 207.

The general rule in this circuit is that "jurisdiction over the individual officers of a corporation may not be based merely on jurisdiction over the corporation, . . . [but] must be [derived from] an independent basis for asserting long-arm jurisdiction." Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902, 906 (1st Cir. 1980) (citations omitted). It is likewise settled law that "an officer of a corporation 'is liable for torts in which he personally participated, whether or not he was acting within the scope of his authority.'" Id. at 907 (quoting Lahr v. Adell Chem. Co., 300 F.2d 256, 260 (1st Cir. 1962)). Furthermore, with respect to the "purposeful availment" inquiry, "knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions." Hugel, supra, 886 F.2d at 4 (citing Calder v. Jones, 465 U.S. 783, 789-90 (1984)).

In consideration of the preceding legal principles, and the

facts as alleged by the plaintiff, the court finds that Sturm can "fairly be charged with such knowledge regarding the effect of his intentional and allegedly tortious actions." VDI Technologies, supra, 781 F. Supp. at 92. Since Sturm's actions appear to be nothing less than voluntary on his part, and the possibility that a New Hampshire domiciliary would seek legal redress for such alleged actions in the courts of this forum is too plainly foreseeable, the court further finds that the "cornerstones" of the "purposeful availment" inquiry have been satisfied. Accordingly, the court finds and rules that the assertion of in personam jurisdiction over Sturm under these circumstances does not offend the dictates of due process.

### (3) The Gestalt Factors

Despite finding sufficient relatedness and minimum contacts to subject Sturm to this court's jurisdiction, the court must "proceed to the third and final element of [the] analysis and inquire whether the exercise of jurisdiction over [Sturm] in the circumstances of this case would, holistically viewed, offend traditional notions of 'fair play and substantial justice.'" Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *25-26 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1984)) (quotations omitted). "'This means that, even where purposefully generated contacts exist, courts must consider a

28

panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal.'" Ticketmaster, supra, 26 F.3d at 209 (quoting United Elec. Workers, supra, 960 F.2d at 1088).

The five factors--dubbed the "gestalt factors" by the First Circuit, see id.; see also United Elec. Workers, supra, 960 F.2d at 1088; Donatelli, supra, 893 F.2d at 465--have been identified by the Supreme Court as the following:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Ticketmaster, supra, 26 F.3d at 209 (citing Burger King, supra, 471 U.S. at 477). Though not ends in themselves, the gestalt factors "are, collectively, a means of assisting courts in achieving substantial justice." Id.

### (a) The Burden of Appearance

This court is cognizant that, to a certain extent, Sturm, a North Carolina domiciliary, will be burdened by being required to appear in New Hampshire. However, "the concept of burden is inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly,

29

[] this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *27.  Sturm has made no such showing.[15]

### (b)  Interest of the Forum

The forum's interest in moderating a suit brought by an aggrieved resident militates heavily in favor of an exercise of jurisdiction.  See, e.g., Keeton, supra, 465 U.S. at 780 ("plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum"); Ticketmaster, supra, 26 F.3d at 211 ("The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders."); Phelps, supra, 130 N.H. at 175, 536 A.2d at 745 ("[T]he State of New Hampshire has a significant interest in affording injured New

---

[15]Although Sturm correctly notes that "the defendant's burden of a distant appearance . . . 'alone among the gestalt factors, is "always a primary concern,"'" Sturm's Motion to Dismiss at 14 (quoting Ticketmaster, supra, 26 F.3d at 210 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980))), such enhanced consideration is warranted only in cases "kindred" to Ticketmaster, where "[t]he frailty of [plaintiff's] showings on the first two furcula of the due process inquiry require [the court] to consider the gestalt factors and assess the reasonableness of [the court's] assertion of jurisdiction . . . ." Ticketmaster, supra, 26 F.3d at 212. By virtue of strong showings on the "relatedness" and "purposeful availment" prongs of the jurisdictional inquiry, the case at bar exhibits no apparent consanguinity to Ticketmaster.

30

Hampshire plaintiffs a forum in which to litigate the question of liability for their injuries.").

### (c) The Plaintiff's Convenience

Since the court "must accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience," Ticketmaster, supra, 26 F.3d at 211, and noting the "enormous inconvenience that might result from forcing [Kopf] to sue elsewhere . . . despite ongoing litigation in [the] forum-based court," Pritzker, supra, ___ F.3d at ___, 1994 U.S. App. LEXIS 35101, at *29, the court finds that the plaintiff's interest in obtaining convenient and effective relief cuts in favor of exercising jurisdiction.

### (d) The Administration of Justice

As a result of this court's earlier finding that plaintiff's claims were not compulsory counterclaims to Chloride Power's North Carolina action, see supra part 1.a, the interest of the judicial system in the effective administration of justice is best served by this court's retention of the entire controversy. Kopf's complaint sounds in similar theories against both Chloride Power and Sturm, said defendants are each represented in this action by the same local and North Carolina counsel, and furthermore, to decline jurisdiction in this instance would be

31

antithetical to the goal of judicial economy and may lead to the quandary of inconsistent judgments.

### (e) Pertinent Policy Arguments

In that defendant has not identified any substantive policy which may be advanced by this court's declination of jurisdiction, and the court has previously discussed the strong interest a plaintiff's sovereign shares in providing a forum in which a resident may obtain redress for allegedly discriminatory and tortious activities, the court finds that the policy factor weighs, if at all, in favor of this court's exercise of jurisdiction.

### (4) Summarizing the Calculus

In order for a court to exercise in personam jurisdiction over an out-of-state defendant, there must exist a logical nexus between "the defendant, the forum, and the litigation." Keeton, supra, 465 U.S. at 780. Taking, as this court must, the allegations in the complaint and plaintiff's subsequent affidavit as true, and construing them in a manner most favorable to the plaintiff's position, the court hereby finds that Sturm's contacts with the forum form the very bedrock upon which plaintiff's cause of action is grounded. Ostensibly, Sturm's actions were taken voluntarily, and it is too plain to question

32

that the putative aggrieved, when seeking legal redress, would all but certainly litigate in his resident forum.

Thus having found that the "purposeful availment" cornerstones of foreseeability and voluntariness have been satisfied, and having further found that the instant litigation arises out of, and thus directly relates to, Sturm's contact with New Hampshire, the court further finds and rules that this court's exercise of in personam jurisdiction over Sturm, being neither unreasonable nor fundamentally unfair, is both legally and constitutionally permissible. Defendant Sturm's motion to dismiss for lack of in personam jurisdiction, therefore, must be and herewith is denied.

## Conclusion

For the reasons set forth herein, defendant Chloride Power's Motion to Dismiss (document 6) is granted as to plaintiff's wrongful discharge (Count III) and intentional infliction of emotional distress (Count IV) claims. Chloride Power's motion to dismiss is otherwise denied. Defendant Sturm's motion to dismiss (document 9) is likewise denied.

SO ORDERED.

Shane Devine, Senior Judge
United States District Court

January 12, 1995

33

cc: Edward M. Kaplan, Esq.
    George L. Fletcher, Esq.
    Carol J. Holahan, Esq.