Faigin v. Kelly                          CV-95-317-SD  03/19/96 P

UNITED STATES DISTRICT COURT FOR THE

                         DISTRICT OF NEW HAMPSHIRE


A.J. Faigin


     v.                                      Civil No. 95-317-SD


James E. Kelly;
Vic Carucci


                            O R D E R


     In this diversity action, plaintiff A.J. Faigin, a sports

agent, asserts that he was defamed by statements contained in an

autobiography published by professional football player James E.

Kelly and co-authored by Vic Carucci, a sportswriter.  Currently

before the court is defendants' motion to dismiss for lack of

personal jurisdiction, to which plaintiff objects.


                           Background

     Faigin, an attorney currently residing in California, has

represented collegiate and professional athletes in contract

negotiations with professional sports franchises since 1980.

Complaint ¶ 6.  While associated with Lustig Pro Sports

Enterprises, Inc., Faigin negotiated contracts on behalf of

football player James E. Kelly, including, in 1986, a contract

with the Buffalo Bills football club.  <u>Id.</u> ¶¶ 8-10.  Kelly

subsequently became a starting quarterback for that club.  In

1992, Kelly and Carucci, both residents of New York, published

Kelly's autobiography, <u>Armed and Dangerous</u>.  <u>Id.</u> ¶ 15.  The book

contains the following statements that allegedly defamed Faigin:

> "I was in Akron, Ohio, where my agents at the time--Greg Lustig, A.J. Faigin and Weinberger-- were based.  (<u>I wanted to use another word besides 'agents' here, but that's better left for the lawsuit that is currently pending in Texas.  My mother always said if you don't have anything good to say about somebody, don't say anything at all.</u>)
> . . . .
> <u>I learned my lesson the hard way about whom to trust and whom not to trust in business.</u>  I <u>had had complete faith</u> in my first agents, Greg Lustig and <u>A.J. Faigin</u>.  Before signing with them out of college, I talked to a bunch of other players they represented and they all said Lustig and Faigin did a good job on their contracts.  Even Jack Lambert, the former Steeler great, gave them a strong recommendation.
> Then Danny and the Trevino brothers started taking <u>a closer look at my business affairs</u>.  And <u>the more they looked, the more they didn't like what they found</u>.
> <u>Finally I saw the light.  In 1988, I fired Lustig and Faigin</u> and put my brother and the Trevinos in charge of all my business dealings.  Then I filed a major lawsuit against my former agents as well as the former owners of the Gamblers for defaulting on the payment of my signing bonus.
> Fortunately, <u>I was able to catch the problem before it was too late, which made me luckier than a lot of other pro athletes.</u>"

<u>Id.</u> at 15 (emphasis in complaint).

2

Kelly and Carucci entered an arrangement with Bantam Doubleday Dell Publishing Group, Inc., to publish the book. Under the agreement, defendants sold the manuscript to Doubleday in exchange for a cash advance and a percentage of the royalties derived from sale of the book. Declaration of James E. Kelly ¶ 5 (attached to Defendants' Motion to Dismiss). Doubleday controlled the distribution, marketing, and sale of the book. Id. Doubleday sold at least 36 copies of Armed and Dangerous in the state to approximately seven stores.[1] Agins Affidavit ¶¶ 3, 4. These sales represent 0.13% of the total sales of the book nationwide. Id. ¶ 3. According to plaintiff, Doubleday is "one of the largest national publishing companies in North America," and the book's cover is designed to appeal to football fans across the country. Plaintiff's Objection at 13.

Faigin filed the present action on June 23, 1995. Plaintiff has previously filed an action in the United States District Court for the Northern District of Illinois on August 20, 1993, against the present defendants and Doubleday. See Exhibit A, attached to Defendants' Motion to Dismiss. Plaintiff voluntarily dismissed such action without prejudice on January 25, 1994. See

---

[1]In addition to the identified books, an unidentified number of books may have been sold by Walden bookstores in New Hampshire from a "Walden Retail Distribution Center" of unknown location. Affidavit of Gregg Agins ¶ 4 (attached to Defendants' Motion to Dismiss).

3

Exhibit B, attached to Defendants' Motion to Dismiss. Faigin subsequently filed a similar suit in the United States District Court for the Eastern District of Wisconsin on June 10, 1994, but that court dismissed the suit against Kelly and Carucci for lack of personal jurisdiction. See Exhibits C and D, attached to Defendants' Motion to Dismiss.

Discussion

1. Personal Jurisdiction

When personal jurisdiction is challenged, the plaintiff bears the burden of persuading the court that the defendants' contacts with the forum state satisfy both the state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995) (citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Dalmau Rodriquez v. Hughes Aircraft Co., 781 F.2d 9, 10 (1st Cir. 1986); Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)) (other citations omitted).

To determine whether plaintiff has met such burden, the court may select the prima facie method, which is the preferred approach to cases that do not involve conflicting versions of the facts, or material issues of credibility. Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145-46 (1st Cir. 1995);

4

<u>Boit v. Gar-Tec Prods., Inc.</u>, 967 F.2d 671, 675-76 (1st Cir. 1992). To make a prima facie showing, the plaintiff must go beyond the pleadings and "adduce evidence of specific facts." <u>Foster-Miller</u>, <u>supra</u>, 46 F.3d at 145; <u>accord</u> <u>Boit</u>, <u>supra</u>, 967 F.2d at 675. The district court, in turn, should accept plaintiff's properly supported evidence as true, much as it would treat a satisfactorily supported motion for summary judgment as provided by Rule 56(c), Fed. R. Civ. P. <u>Id.</u>; <u>Boit</u>, <u>supra</u>, 967 F.3d at 675. Thus, the court draws "the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by plaintiff as true and construing disputed facts in the light most hospitable to plaintiff." <u>Ticketmaster</u>, <u>supra</u>, 26 F.3d at 203.

Rule 12, Fed. R. Civ. P., provides that the defense of lack of personal jurisdiction "shall be heard and determined before trial on application of any party, unless the court orders that the hearing and determination thereof be deferred until the trial." Rule 12(d), Fed. R. Civ. P. If a motion to dismiss is granted after the court applies the prima facie standard, then the motion is "'heard and determined before trial'" in compliance with the rule. <u>See</u> <u>Boit</u>, <u>supra</u>, 967 F.2d at 676 (quoting Rule 12(d)). However, if the court denies the motion to dismiss, "it is implicitly, if not explicitly, ordering 'that hearing and

5

determination [of the motion to dismiss] be deferred until the trial.'"  Id. (quoting Rule 12(d)) (alteration in Boit).

## 2.  The New Hampshire Long-Arm Statute

In diversity cases, the forum's long-arm statute governs whether the district court has personal jurisdiction over a nonresident defendant.  Sawtelle, supra, 70 F.3d at 1387.  The relevant New Hampshire long-arm statute permits the exercise of jurisdiction over nonresident defendants who "in person or through an agent. . . commit[] a tortious act within [the] state . . . ."  New Hampshire Revised Statutes Annotated (RSA) 510:4, I (1983 & Supp. 1994).

The New Hampshire long-arm statute applicable to individuals affords jurisdiction "'to the full extent that the statutory language and due process will allow.'"  Sawtelle, supra, 70 F.3d at 1388 (quoting Phelps v. Kingston, 130 N.H. 166, 171, 536 A.2d 740, 742 (1987)).  "[W]hen a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards."  Id. (citation omitted); accord Estabrook v. Wetmore, 129 N.H. 520, 523, 529 A.2d 956, 958 (1987) ("This court has consistently interpreted [the long-arm statute] to grant

6

jurisdiction whenever the due process clause of the United States Constitution permits it.") (citing <u>Roy v. North Am. Newspaper Alliance, Inc.</u>, 106 N.H. 92, 95, 205 A.2d 844, 846 (1964)); <u>see also</u> <u>Kopf v. Chloride Power Elecs., Inc.</u>, 882 F. Supp. 1183, 1192 (D.N.H. 1995). Accordingly, although the parties dispute whether the defendants' contacts with New Hampshire satisfy the long-arm statute, the court need not address the issue, and instead may proceed directly to the federal constitutional question.

### 3. Federal Due Process

To comport with the federal due process clause, plaintiff must show the existence of "minimum contacts" between the defendants and the forum state. <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 291 (1980) (quoting <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)). To establish minimum contacts on a theory of specific jurisdiction,[2] plaintiff must make the following demonstrations: (1) that defendants purposefully availed themselves of the privilege of conducting business in the forum state, <u>Ticketmaster</u>, <u>supra</u>, 26 F.3d at 206

---

[2]As plaintiff has not claimed that jurisdiction should be based on defendants' contacts with the state outside of the acts from which the cause arises, the court need not address the requirements of general jurisdiction. <u>See</u>, <u>infra</u> note 7 (distinguishing general from specific jurisdiction).

7

(citing <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)); and (2) that the cause "'arises out of, or relates to' defendant[s'] contacts with the forum state," <u>id.</u> (quoting <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414 (1984)). Once plaintiff succeeds in making such showings, the defendants may still win the jurisdictional battle if they establish that defending a suit in the forum state would be a fate "inconsistent with 'fair play and substantial justice.'" <u>Id.</u> (quoting <u>International Shoe</u>, <u>supra</u>, 326 U.S. at 320).

## 3. Purposeful Availment and Relatedness

The exercise of jurisdiction over a nonresident defendant is permissible if the defendant has "purposefully directed his activities at residents of the forum." <u>See</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472 (1985) (quotation omitted). The mere fact that it may have been foreseeable to the defendant that his conduct would cause injury in another state will not suffice, without more, to support jurisdiction. <u>Id.</u> at 474 (citing <u>World-Wide Volkswagen</u>, <u>supra</u>, 444 U.S. at 295). "[R]andom, isolated, or fortuitous" acts will not do, <u>see</u> <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 774 (1984); nor can jurisdiction be premised solely on the "'unilateral activity of another party or a third

person,'" Burger King, supra, 471 U.S. at 475 (citing Helicopteros, supra, 466 U.S. at 417).

Instead, the due process clause requires that a defendant's contacts with the forum state be such that "'he should reasonably anticipate being haled into court there.'" Id. (quoting World-Wide Volkswagen, supra, 444 U.S. at 297). There should be "'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Asahi Metal Ind. v. Superior Ct. of Cal., 480 U.S. 102, 109 (1987) (quoting Burger King, supra, 471 U.S. at 475). Defendant's contacts must "'proximately result from actions by the defendant himself that create a "substantial connection" with the forum State.'" Id. (quoting McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957)). Furthermore, to satisfy the relatedness element of due process,[3] there must be a sufficient nexus between the defendant's contacts and the plaintiff's cause of action. Ticketmaster, supra, 26 F.3d at 206.

Several opinions from the Supreme Court and the First Circuit have applied the above tenets in the context of

---

[3]Although the defendants do not precisely claim that the relatedness element is lacking, the court will construe defendants' argument under the New Hampshire long-arm statute as a challenge to relatedness under the federal Constitution.

9

defamation suits against a nonresident defendant who has published within the forum. The court will first examine Calder v. Jones, 465 U.S. 783 (1984), cited by both parties.[4] In Calder, the court found that California could exercise jurisdiction over the defendants, who wrote and edited a defamatory article in Florida about a professional entertainer who lived and worked in California. Focusing on the plaintiff's contacts with the forum, the court reasoned defendants' intentional tortious actions were "expressly aimed at California" and that the "brunt of [plaintiff's] injury" would be felt in the state in which she lived, California. Id. at 789-90. Kelly's and Carucci's purposeful availment cannot be premised on a Calder-type theory. Defendants did not expressly target Faigin's reputation in New Hampshire, nor was the brunt of Faigin's injury[5] felt here. Although Faigin is not helped by Calder, neither is he destroyed by it. The Calder court chose to rely on plaintiff's contacts to find jurisdiction, but it by no means held that such method was the only means of finding jurisdiction

_____

[4]Calder is much less relevant than Keeton, although Calder specifically discusses jurisdiction over an author in a libel action.

[5]Faigin suffered some injury to his reputation in New Hampshire, even though he is not a resident, because the "reputation of the libel victim may suffer harm even in a State in which he has hitherto been anonymous." Keeton, supra, 465 U.S. at 777.

over the author of a defamatory article; in fact, the court expressly states that such reliance is unnecessary when there is an otherwise proper foundation[6] to support jurisdiction.  Id. at 788 (citing Keeton, supra, 465 U.S. at 779-81).  Accordingly, Calder's "brunt of the injury" criterion is not dispositive.

In Keeton, plaintiff, a resident of New York, sued Hustler Magazine, Inc., and other defendants in the United States District Court for the District of New Hampshire, claiming that she was libeled in five separate issues of the magazine.  Keeton, supra, 465 U.S. at 772.  Hustler Magazine is an out-of-state corporation which sold from 10,000 to 15,000 copies of the magazine per month in New Hampshire.  Id.  However, only a small portion of the five issues in question were distributed in New

_____

[6]Unlike the situation presented here, such basis did not exist in Calder because the individual defendants had no direct financial stake in the circulation of the article in California.

> Petitioners argue that they are not responsible for the circulation of the article in California. A reporter and an editor, they claim, have no direct economic stake in their employer's sales in a distant State.  Nor are ordinary employees able to control their employer's marketing activity. The mere fact that they can "foresee" that the article will be circulated and have an effect in California is not sufficient for an assertion of jurisdiction.

Id. at 789 (citations omitted).

11

Hampshire. Id. at 775. The court found that New Hampshire could exert jurisdiction over Hustler because Hustler had "continuously and deliberately exploited the New Hampshire market" and therefore could reasonably anticipate being sued in New Hampshire for defamation arising from such contacts. Id. at 781; accord Buckley v. McGraw-Hill, Inc., 762 F. Supp. 430, 438 (D.N.H. 1991). Otherwise stated, the Keeton court relied upon a hybridization of the defendant's general[7] and specific contacts with the forum to establish that defendant's relationship to New Hampshire was not random or isolated.

As their general contacts with the state are almost entirely lacking, Kelly and Carucci do not have sufficient contacts with New Hampshire to support jurisdiction of the exact nature found in Keeton. However, the alleged facts do comport with what this court considers to be the spirit, if not the letter, of the holding in Keeton, which counsels that the focus should be on whether there was deliberate exploitation of the forum's market. The rationale animating other courts to exercise specific

---

[7]General jurisdiction exists when defendant has engaged in continuous and systematic activity within the forum state, even if such contact is unrelated to the litigation. See Pritzker v. Yari, 42 F.3d 53, 59-60 (1st Cir. 1994). "Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendants' forum-based contacts.'" Id. at 60 (quoting United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088-89 (1st Cir. 1992)).

jurisdiction also supports jurisdiction here.  In considering specific jurisdiction, the emphasis should be on the qualitative nature of defendants' relationship with the forum, and not necessarily on the quantitative aspect.  Pritzker, supra note 7, 42 F.3d at 63; cf. Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1561-69 (Fed. Cir. 1994) (holding in patent infringement action that defendant who, through intermediary, shipped 52 fans to six outlets in forum state, had "purposefully directed" its activities toward the forum); Vault Corp. v. Quaid Software Ltd., 775 F.2d 638, 640 (5th Cir. 1985) (finding that Louisiana could exert jurisdiction over computer software corporation because 510 sales of its product in Louisiana were not random or fortuitous, even though they constituted only 0.3 percent of defendants' total revenue).

Viewing the evidence in a light most amiable to plaintiff, defendants purposefully availed themselves of the New Hampshire market.  Defendants wrote a book aimed at a national audience and then entrusted it to a national publisher.  In their agreement with Doubleday, they retained the right to collect a certain percentage of the royalties derived from the sales of Armed and Dangerous, and thereby arguably had a vested interest in such

13

sales.[8]  It was thus no mere fortuity that the books wound up in New Hampshire.  The books did not arrive in New Hampshire as a result of the unilateral activity of a third party, nor did they arrive because a consumer brought them here, or some other random event.  Instead, their presence resulted from an arguably deliberate effort by defendants, acting through Doubleday, to participate in New Hampshire's economy and to "exploit" at least seven stores here.[9]  Finally, the plaintiff's injury in New Hampshire arose directly from the defendants' contacts with New Hampshire.

The court is unpersuaded by defendants' argument that because Faigin does not reside in New Hampshire, any injury suffered here was fortuitous.  As Keeton observed, the tort of

---

[8]In light of defendants' arrangement with Doubleday, this case does not resemble the typical "stream of commerce" situation in which a company sells its goods outright to a wholly independent distributor, who in turn markets the goods in the forum for its own benefit.  Instead, defendants are more akin to a company that demonstrates its intent to serve the market of the forum state by marketing a product through a distributor who has agreed to serve as a sales agent in that state.  See Asahi, supra, 480 U.S. at 112.

[9]Plaintiff asks the court to take the further step of inferring from the large presence of New England Patriots fans in New Hampshire that the defendants intended to exploit this state's marketplace.  Plaintiff makes the somewhat inscrutable argument that because the Patriots are traditional rivals of the Buffalo Bills, and Kelly sometimes plays in New England, one can assume that defendants had a business interest in selling books here.  Without more direct evidence of defendants' motives, plaintiff's contention does not deserve additional attention.

14

libel occurs wherever the defamatory material is circulated.

Keeton, supra, 465 U.S. at 777.  The court continued,

> [P]laintiff's residence in the forum State is not
> a separate requirement, and lack of residence will
> not defeat jurisdiction established on the basis
> of defendant's contacts.
>    It is undoubtedly true that the bulk of the harm
> done to petitioner occurred outside New Hampshire.
> But that will be true in almost every libel action
> brought somewhere other than the plaintiff's
> domicile.  There is no justification for
> restricting libel actions to the plaintiff's home
> forum.

Id. at 780.  Thus, although the bulk of Faigin's injury occurred

elsewhere, this will not defeat jurisdiction established by

defendants' contacts.

There is no doubt that plaintiff's showing of purposeful

availment and relatedness is very weak, given the small number of

book sales in New Hampshire and defendants' somewhat attenuated

relationship to those sales.[10]  Nonetheless, plaintiff has

supplied the bare minimum to permit the court to proceed to the

reasonableness phase of the due process analysis.

---

[10]Although central to plaintiff's argument, he does not
provide the percentage of book royalties to which Kelly and
Carucci are entitled; whatever that percentage is, defendants'
net take from the New Hampshire sales is certainly small.

15

## 4. Fair Play and Substantial Justice

The fair play and substantial justice component of the due process analysis requires consideration of five factors, also known as "gestalt factors": (1) the burden on the defendant of appearing in the forum; (2) the forum state's interest in the adjudication of the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all states in promoting substantive social policies. Sawtelle, supra, 70 F.3d at 1394 (citing Burger King, supra, 471 U.S. at 477). The guiding principle must be the concept of reasonableness. Id.

Defendants' burden at this stage is directly proportional to the showing made by plaintiff of purposeful availment and relatedness. Id. (citing Ticketmaster, supra, 26 F.3d at 210). As Faigin's showings of relatedness and purposeful availment are tenuous, a solid showing of reasonableness is required to support jurisdiction.

The first gestalt factor, the burden associated with forcing defendants to appear in the forum state, is "entitled to substantial weight in calibrating the jurisdictional scales." Ticketmaster, supra, 26 F.3d at 210 (comparing personal jurisdiction cases by virtue of the distance defendant would have

16

to travel to defend suit).  Kelly and Carucci both reside and work in Buffalo, New York.  While defendants are not so close as to be our neighbors, the distance is not unduly onerous.  Compare Beverly Hills Fan, supra, 21 F.3d at 1569 (finding that burden placed on New Jersey defendant to travel to Virginia is not significant) with Ticketmaster, supra, 26 F.3d at 210 (holding that burden on Californian to appear in Massachusetts is onerous) (and cases cited therein).  Thus, this important factor cuts in plaintiff's direction.

The second consideration is New Hampshire's interest in adjudicating the dispute.  For reasons expressed in Keeton, New Hampshire has a significant interest in protecting nonresidents from being libeled in the state.[11]  Keeton, supra, 465 U.S. at 775-77; see also Ticketmaster, supra, 26 F.3d at 211 (noting that state has an interest in obtaining jurisdiction over a party causing tortious injury within the forum).  New Hampshire's interest exists even if only a small portion of the defamatory material is distributed in New Hampshire.  Id. at 775; but see Sawtelle, supra, 70 F.3d at 1395 (finding that New Hampshire has a far smaller interest in adjudicating a controversy where the

---

[11]Among the reasons cited in Keeton are New Hampshire's expressed interests in protecting nonresidents from libel and in preventing New Hampshire citizens from being deceived by such libel.  Keeton, supra, 465 U.S. at 776-77.

17

vast majority of the injury, and the acts causing the injury, occurred outside the state).  Accordingly, although the majority of Faigin's reputational injury appears to have occurred outside New Hampshire, the second gestalt factor weighs in favor of jurisdiction.

The third factor, plaintiff's interest in obtaining convenient and effective relief, slightly supports jurisdiction. While the court must accord deference to the plaintiff's choice of forum, this is mitigated by the fact that plaintiff, currently a resident of California, is not here for his own convenience. See, e.g., Ticketmaster, supra, 26 F.3d at 201 (rejecting convenience argument on similar grounds).  However, plaintiff does appear to have an interest in effective relief, especially as the limitations periods seem to have run out in virtually every other state.  As Keeton found, there is no unfairness inherent in a plaintiff's choosing New Hampshire because of its lengthy statute of limitations.  Keeton, supra, 465 U.S. at 779 ("[Plaintiff's] successful search for a State with a lengthy statute of limitations is no different from the litigation strategy of countless plaintiffs who seek a forum with favorable substantive or procedural rules or sympathetic local populations.").  The court is troubled by plaintiff's express admission that he filed the cause in New Hampshire out of a hope

18

that this court would be more generous on the personal jurisdiction question than was the United States District Court for the Eastern District of Wisconsin.[12]  See Plaintiff's Memorandum at 5.  Nonetheless, given Keeton, this concern would not suffice to tip the scales in defendants' favor here.

The fourth factor, the judicial system's interest in obtaining the most effective resolution of the controversy, weighs in plaintiff's favor.  The "single publication rule" permits a forum to litigate all issues and damages claims arising out of a libel in one proceeding.  Keeton, supra, 465 U.S. at 777.  Such rule reduces "the drain of libel cases on judicial resources" and serves to protect defendants from the harassment resulting from multiple suits.  Id.  Accordingly, permitting the litigation to proceed here would somewhat serve the judicial system's interest in obtaining the most effective resolution of the controversy, especially as it would prevent plaintiff from seeking relief in yet another forum.

The fifth factor, the common interest of all states in promoting effective social policies, does not appear to cut in any party's favor.

---

[12]Plaintiff's argument for jurisdiction raised before the federal court in Wisconsin is very similar to the argument he presents now.

Finally, beyond the five enumerated gestalt factors, it is legitimate to consider the general fairness of compelling defendants to litigate in the forum. In considering fairness, Keeton reasoned as follows: "Respondent produces a national publication aimed at a nationwide audience. There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." Id. at 781. By analogy, Kelly and Carucci wrote a book for national publication aimed at a national audience. The court perceives no unfairness in compelling them to defend a suit in this state, where a significant number of the books were sold.

To summarize, plaintiff has presented the very bare minimum needed to establish purposeful availment and relatedness. Such a showing can support jurisdiction only if fortified by an "especially solid" showing of reasonableness. Sawtelle, supra, 70 F.3d at 1396. Fortunately for plaintiff, the gestalt factors and other fairness concerns provide the requisite support. The court therefore must deny defendants' motion to dismiss.

20

<u>Conclusion</u>

For the reasons set forth herein, the court denies defendants' motion to dismiss for lack of personal jurisdiction (document 3).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

March 19, 1996

cc:  Wilbur A. Glahn III, Esq.
     Alan J. Mandel, Esq.
     William L. Chapman, Esq.

21