Brew v. Ferraro                      CV-96-615-JD  10/16/96
                   UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF NEW HAMPSHIRE


Mary J. Brew

       v.                                    Civil No. 95-615-JD

Thomas Ferraro, M.D., et al.


                              O R D E R


       The plaintiff, Mary Brew, brought this tort action alleging,
inter alia, that defendant Dr. Guy W. Leadbetter, Jr., harmed her
through negligent and intentional acts while providing her with
medical treatment.  Before the court is Leadbetter's motion to
dismiss the case for lack of personal jurisdiction (document no.
19).


                             Background

       The plaintiff, currently a resident of Washington, D.C.,
resided in New Hampshire when she was first treated by
Leadbetter, a urologist, in 1963.  Leadbetter then resided in
Massachusetts but since 1967 has resided in Vermont.  Leadbetter
treated the plaintiff in both Massachusetts and Vermont but not,
he attests, in New Hampshire, where he has never been licensed to
practice medicine.  His objection to the court's exercise of
personal jurisdiction over him in New Hampshire requires the

court to recount the plaintiff's relevant medical history as alleged by the plaintiff.

In 1963, Dr. Thomas Ferraro diagnosed the plaintiff, at the time a four-year-old suffering from urinary tract infections ("UTIs") and incontinence, with a congenital defect in her bladder neck. In February 1963, Ferraro performed an operation on the plaintiff to correct this condition but negligently destroyed her urethra during the operation. Ferraro then concealed his negligence from the plaintiff and her parents. As a result, the plaintiff and her parents believed that all subsequent medical treatment the plaintiff received represented continuing efforts to correct her congenital bladder neck defect.

In June 1963, Ferraro referred the plaintiff to Leadbetter in Massachusetts, where, in July 1963, Leadbetter first treated her. After an initial consultation at which Leadbetter placed the plaintiff on a six-month drug therapy regimen to ascertain the cause of her incontinence, the plaintiff returned to New Hampshire. On May 6, 1964, the plaintiff went back to Massachusetts where Leadbetter performed a new experimental surgery, now known as the Leadbetter procedure, on her in an effort to reconstruct her urethra. Leadbetter failed to provide the plaintiff with adequate post-operative care and did not inform the plaintiff or her parents at any time either that she

2

had suffered injury from Ferraro's initial surgery or that Leadbetter had reconstructed her urethra. After a twenty-three-day hospital stay in Massachusetts, the plaintiff was discharged to Ferraro's care in New Hampshire.

On March 26, 1965, the plaintiff returned to Massachusetts to undergo a procedure for which Leadbetter had referred her. Despite treatment, the plaintiff continued to suffer from UTIs, and Ferraro consulted with Leadbetter about how best to treat her. An August 4, 1968, medical record prepared by Ferraro indicates that Leadbetter suggested a treatment, "bi-monthly dilatations," which Ferraro performed. Plaintiff's Affidavit in Support of Opposition to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction ("Brew Aff."), Ex. 9.

The plaintiff's medical problems continued, allegedly in part because of Leadbetter's procedure and lack of disclosure about it. During the course of her treatment, the plaintiff underwent frequent catheterizations so that her urine could be tested, but her reconstructed urethra was narrower and set at a different angle than a normal urethra. Leadbetter's failure to inform other health care professionals of the details of the plaintiff's surgically reconstructed urethra exacerbated the pain of the catheterizations. Beginning in 1968, the catheterizations also caused kink-like blockages called strictures in the

3

plaintiff's urethra, making it progressively more difficult for her to void urine and reducing the functionality of her reconstructed urethra.

During the winter of 1968 and again in December 1973, Ferraro sent the plaintiff to see Leadbetter in Vermont, where Leadbetter treated her. The plaintiff's condition temporarily improved, but by September, 1974, her difficulty urinating had increased. She again saw Ferraro, and in July, 1975, he again referred the plaintiff to Leadbetter in Vermont. On this occasion, apparently the last time Leadbetter saw the plaintiff, he advised her that her best option was to self-catheterize on a regular and permanent basis.

Although he avows that he never treated the plaintiff in New Hampshire,[1] Leadbetter was paid for the medical services he provided to the plaintiff by a New Hampshire health insurance company. After he performed the Leadbetter procedure on the plaintiff, Leadbetter wrote at least two articles for medical journals concerning the procedure and reporting on the plaintiff's progress. One article was published in 1967, about three years after her operation, and the other in 1985, some

---

[1]The plaintiff contests this assertion and has produced a hospital record in which Ferraro states that Leadbetter once treated the plaintiff in New Hampshire. Brew Aff., Ex. 16. The court discusses its treatment of this conflicting evidence infra note 5.

4

twenty years after the initial surgery and ten years after Leadbetter had last treated the plaintiff. Leadbetter did not advertise or otherwise solicit business in New Hampshire and did not regularly receive referrals from New Hampshire doctors. The plaintiff is the only patient Ferraro referred to Leadbetter.

Ultimately, the plaintiff discovered the facts that form the basis of her complaint and brought this action.[2] Leadbetter moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), asserting that the court cannot properly exercise personal jurisdiction over him as to the plaintiff's claims.

## Discussion

Leadbetter asserts that the plaintiff's claims against him should be dismissed for lack of personal jurisdiction because he committed no tort in New Hampshire and the mere treatment of a New Hampshire resident by an out-of-state physician is insufficient to form a constitutional basis for the exercise of jurisdiction. The plaintiff asserts that Leadbetter's super-

---

[2]The plaintiff alleges a total of six counts against Leadbetter: (1) he wrongfully concealed and failed to disclose Ferraro's negligence and his own role in her treatment; (2) he failed to provide adequate post-operative care; (3) his surgery was a medical battery because he failed to disclose its true nature and purpose; (4) he committed malpractice in his diagnosis and treatment of her; and (5 & 6) he intentionally and negligently inflicted emotional distress on her.

5

vision of Ferraro amounted to a principal-agent relationship, making Ferraro's New Hampshire contacts attributable to Leadbetter and resulting in sufficient contacts with New Hampshire to justify the court's exercise of specific personal jurisdiction in this action.[3]

The "preferred" method of deciding a motion to dismiss for lack of personal jurisdiction in cases that do not involve conflicting versions of the facts is the "prima facie" approach. Faigin v. Kelly, 919 F. Supp. 526, 529 (D.N.H. 1996).[4] Under this method, the plaintiff has the burden of demonstrating facts sufficient to raise a reasonable inference that the court has personal jurisdiction over Leadbetter. E.g., Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992). The plaintiff may establish jurisdiction through specific facts alleged in the pleadings, affidavits, and exhibits. Id. The decision to exercise jurisdiction based on a prima facie showing is

_____

[3]The plaintiff asserts in the alternative that Leadbetter and Ferraro were jointly treating the plaintiff. However, due to its holding, the court need not consider the ramifications of that theory at this time.

[4]Although alternative methods of resolving jurisdictional questions exist, neither party has requested that the court use another method to resolve the instant motion. Thus, the court uses this method despite the fact that some factual issues in this case are contested. In doing so, the court does not resolve the factual disputes, but "accepts properly supported proffers of evidence by a plaintiff as true." Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992).

provisional, for if a district court "applies the prima facie standard and denies the motion to dismiss, it is implicitly, if not explicitly, ordering 'that hearing and determination [of the motion to dismiss] be deferred until the trial.'" Id. at 676 (quoting Fed. R. Civ. P. 12(d)) (alteration in original).

Specific personal jurisdiction over a defendant may be appropriate when the cause of action arises directly out of, or relates to, the defendant's contacts with the forum state. Ticketmaster -- New York, Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994); United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088-89 (1st Cir. 1992). In determining whether specific personal jurisdiction is proper, the court initially determines whether the applicable long-arm statute is satisfied, Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 10 (1st Cir. 1986),[5] and then determines whether the exercise of personal jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

---

[5]Because N.H. Rev. Stat. Ann. § 510:4 (1983), the New Hampshire long-arm statute applicable to individuals, affords jurisdiction "to the full extent that the statutory language and due process will allow," Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995); Faigin, 919 F. Supp. at 529; Phelps v. Kingston, 130 N.H. 166, 171, 536 A.2d 740, 742 (1987), the court need only consider whether the exercise of personal jurisdiction comports with the requirements of due process. See, e.g., Interadd v. Foreign Motors, Inc., No. C-94-560-SD, 1995 WL 40058, at *5, (D.N.H. Feb. 2, 1995); Estate of Mullen v. Glick, No. C-94-377-L, 1994 WL 605718, at *2 (D.N.H. Nov. 3, 1994).

7

Boit, 967 F.2d at 674-75; Omni Hotels Mgmt. Corp. v. Round Hill

Devs. Ltd., 675 F. Supp. 745, 748 (D.N.H. 1987); see

International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

Under International Shoe,

> due process requires only that in order to subject a
> defendant to a judgment in personam, if he be not
> present within the territory of the forum, he have
> certain minimum contacts with it such that the
> maintenance of the suit does not offend "traditional
> notions of fair play and substantial justice."

Id. (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

Jurisdiction is proper only when "`the defendant's conduct and

connection with the forum State are such that he should

reasonably anticipate being haled into court there.'" Burger

King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting World-

Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980)).

As a threshold matter in determining whether the defendant's

contacts with a forum are sufficient to comport with the

requirements of due process, the court must define the relevant

forum-related conduct. Mitrano v. Jerry's Ford Sales, Inc., No.

95-266-JD, slip op. at 11 (D.N.H. Oct. 6, 1995). The relevant

forum-related conduct includes not only the acts of the

individual to be haled into court, but also the acts of agents of

that individual. See Kennedy v. Ziesmann, 526 F. Supp. 1328,

1329 n.1 (E.D. Ky. 1981) (affidavit asserting that doctors were

acting as agents of hospital justified exercise of personal

8

jurisdiction over hospital); <u>Soares v. Roberts</u>, 417 F. Supp. 304, 307 (D.R.I. 1976) (activities of agents may be attributed as relevant contacts to principal corporation, but not vice versa); <u>see also</u> <u>Salpoglou v. Shlomo Widder, M.D., P.A.</u>, 899 F. Supp. 835, 838 (D. Mass. 1995) (contacts of doctor's agents with forum analyzed as part of personal jurisdiction analysis for doctor). One doctor can act as the agent of another where the principal-doctor exercises control as to the manner in which the work of the agent-doctor is performed. <u>See</u> <u>Gilinsky v. Indelicato</u>, 894 F. Supp. 86, 93 (E.D.N.Y. 1995) (physician who subordinates independent professional judgment to the direction of another physician acts as agent of the directing physician); <u>Restatement (Second) of Agency</u> § 223 cmt. a (1958) (hospital physician may be servant of hospital if "subject to directions as to the manner in which [the] work is performed").

The First Circuit employs a tripartite test for determining whether relevant forum-related conduct constitutes sufficient minimum contacts to justify the exercise of specific juris-diction. <u>United Elec. Workers</u>, 960 F.2d at 1089; <u>see also</u> <u>Ticketmaster</u>, 26 F.3d at 206. First, the plaintiff must allege that the claim underlying the litigation directly arises out of, or relates to, the defendant's forum-state activity. <u>Ticket-master</u>, 26 F.3d at 206. To satisfy this requirement, the

9

defendant's in-state conduct must form an important or material element of proof in the plaintiff's case. United Elec. Workers, 960 F.2d at 1089. The First Circuit has analogized this requirement to the causation requirement in tort law, and has suggested that it requires a showing of both but-for and proximate causation, i.e., "that the injury would not have occurred 'but for' the defendant's forum-state activity," and that "the defendant's in-state conduct gave birth to the cause of action." Id.; see Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994) (relatedness element satisfied where contract at issue arose from the defendant's in-forum activity, and that the dispute would not have occurred but for such activity), cert. denied, 115 S. Ct. 1959 (1995).

Second, the plaintiff must show that "the defendant's in-state contacts . . . represent a purposeful availment of the privilege of conducting activities within the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." United Elec. Workers, 960 F.2d at 1089. Third, even if the plaintiff succeeds in establishing relatedness and purposeful availment, the defendant may still avoid the exercise of jurisdiction if allowing the action to proceed would be "inconsistent with fair play and substantial

justice." Ticketmaster, 26 F.3d at 209-10; see also United Elec. Workers, 960 F.2d at 1089. This determination involves consideration of the "gestalt" factors -- five criteria identified by the United States Supreme Court as relevant in determining whether asserting personal jurisdiction over a defendant is fundamentally fair -- in light of the strength or weakness of the relatedness and purposeful availment demonstrations. Ticketmaster, 26 F.3d at 209-10.[6] The gestalt factors are

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

United Elec. Workers, 960 F.2d at 1088 (citing Burger King, 471 U.S. at 477).

In this case, the outcome of the minimum contacts analysis depends on the threshold question of what constitutes the

---

[6]The First Circuit has made clear that a weak demonstration of relatedness or purposeful activity will be relevant in the third prong of the inquiry, i.e., whether exercising jurisdiction over the defendant comports with traditional notions of fair play and substantial justice. Ticketmaster, 26 F.3d at 210. However, a complete failure to demonstrate relatedness or purposeful availment does not merely "carry over" into the third part of the inquiry. Rather, such a failure is dispositive of the jurisdictional issue. See id. at 207 (permitting the court to "dismiss a . . . case for lack of relatedness per se").

relevant forum-related conduct.  In resolving this issue, the court first analyzes Leadbetter's own contacts with New Hampshire, and then addresses the impact of the plaintiff's agency argument.

I.    Leadbetter Contacts

Leadbetter's relevant contacts with New Hampshire include: telephone conversations with Ferraro in New Hampshire in which he discussed the plaintiff's treatment; his one-time treatment of the plaintiff in New Hampshire sometime shortly before January 20, 1975 ("Leadbetter's New Hampshire visit"); Ferraro's continuing referrals of the plaintiff to Leadbetter for treatment; and, receipt of payment for medical services he provided to the plaintiff from a New Hampshire insurance company. Although these contacts in some sense relate to or arise from the plaintiff's cause of action, see Ticketmaster, 26 F.3d at 206, and form an important or material element of proof in the plaintiff's case, United Elec. Workers, 960 F.2d at 1089, it is less clear that they are the legal and factual cause of the plaintiff's cause of action, see id.  Leadbetter's New Hampshire visit was ten years after the initial Leadbetter procedure.  Some of the plaintiff's counts against Leadbetter allege harm caused by his ongoing failure to disclose, but none of the plaintiff's

claims arise directly from Leadbetter's New Hampshire visit. Similarly, although both the conversations between Leadbetter and Ferraro and Leadbetter's receipt of payments are relevant to the plaintiff's cause of action, neither created it. The court finds Leadbetter's contacts to be slightly related, at best, to the plaintiff's cause of action.

The contacts also amount to only a slight showing of purposeful availment. The court acknowledges that Ferraro referred the plaintiff to Leadbetter on several occasions, Leadbetter had several conversations with Ferraro about the plaintiff's treatment, and Leadbetter was paid for his services by a New Hampshire insurance company, thereby raising the inference that Leadbetter purposefully availed himself of the privilege of doing business in New Hampshire. However, the record indicates that Ferraro referred the plaintiff to Leadbetter and that Leadbetter did not actively advertise in New Hampshire or take any affirmative acts to seek out the plaintiff or any other New Hampshire residents. The court finds that Leadbetter's contacts satisfy the purposeful availment requirement, but amount only to a slight showing on this prong.

The court now turns to the third prong of the test, evaluation of the gestalt factors. Gestalt factor one requires the court to consider Leadbetter's burden of appearing. It is in

13

some sense never convenient for a party to mount a defense in a remote forum, but Leadbetter, a Vermont resident, has not demonstrated that it would pose any "special or unusual burden" for him to defend against this action in neighboring New Hampshire. See Sawtelle v. Farrell, 70 F.3d 1381, 1395 (1st Cir. 1995) (quoting Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994) cert. denied, 115 S. Ct. 1959 (1995)). With no evidence to suggest that mounting a defense in New Hampshire would pose any special burden, the court finds that gestalt factor one points in favor of the exercise of personal jurisdiction.

Gestalt factor two requires the court to consider New Hampshire's interest in adjudicating the dispute. Each state has "a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders." Ticketmaster, 26 F.3d at 211. However, the court notes that New Hampshire also has an interest in assuring that its residents continue to have access to medical care otherwise unavailable in New Hampshire, a policy that might be undermined by aggressive assertion of personal jurisdiction over out-of-state physicians. At least one other court has expressed a reluctance to hale before it an out-of-state doctor when the doctor has done little more than provide care to a resident who sought treatment in the doctor's state for fear that as a result out-of-state doctors would refuse to

14

provide needed and otherwise unavailable medical care to the residents of that state.  See Kennedy v. Ziesmann, 526 F. Supp. 1328, 1331-32 (E.D. Ky. 1981).  The court finds that these two policies offset each other, so that gestalt factor two points neither for nor against the exercise of personal jurisdiction.

Gestalt factor three requires the court to consider the plaintiff's interest in obtaining convenient and effective relief.  Both the general directive that "courts considering jurisdictional issues generally should 'accord plaintiff's choice of forum a degree of deference in respect to the issue of [her] own convenience,'" Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 151 (1st Cir. 1995) (quoting Ticketmaster, 26 F.3d at 211), and the specific concern that to decline to exercise jurisdiction over Leadbetter might require the plaintiff to pursue two separate actions support the proposition that allowing this action to go forward serves the plaintiff's interest in obtaining convenient and effective relief.  The court finds that gestalt factor three points in favor of the exercise of personal jurisdiction.

Gestalt factor four requires the court to consider the judicial system's interest in obtaining the most effective resolution of the controversy.  As noted above, if the court declines to exercise personal jurisdiction over Leadbetter in New

15

Hampshire, the plaintiff will be forced to bring her claims against him elsewhere. This would impose on the judicial system the burden of two simultaneous litigations dealing with similar legal and factual issues. While this is a substantial burden on the plaintiff, it is a lesser, but not insignificant burden on the judicial system. Thus, the court finds that gestalt factor four points moderately in favor of the exercise of personal jurisdiction.

Gestalt factor five requires the court to consider the common interests of all sovereigns in promoting substantive social policies. Under this factor, the policies in conflict under gestalt factor two are again relevant. For the same reasons discussed above, the court finds that gestalt factor five points neither for nor against the exercise of personal jurisdiction.

The court finds that all five gestalt factors taken together point only moderately in favor of the exercise of jurisdiction. Given the slight showings of relatedness and purposeful availment and the moderate showing on the gestalt factors, the court finds that Leadbetter lacks sufficient minimum contacts with New Hampshire for this court to exercise jurisdiction over him on the plaintiff's claims based solely on his forum-related conduct. Accordingly, the court turns to the plaintiff's argument that the

16

acts of Ferraro can be attributed to Leadbetter for the purposes of the minimum contacts analysis because Ferraro was acting as Leadbetter's agent.

II.  Ferraro-Leadbetter Contacts

Two sets of facts support the plaintiff's contention that Ferraro was acting as Leadbetter's agent:  1) facts indicating that it was foreseeable to Leadbetter when he performed the initial operation on the plaintiff that continuing medical care and monitoring of her would be required; and 2) facts indicating that an agency relationship was formed to provide this care.  The record indicates that when Leadbetter performed his new experimental surgery on the plaintiff in 1964, he knew or should have known that the surgery would require continued monitoring of her. Leadbetter had already written one article on the Leadbetter procedure noting the need for further trial and monitoring of the procedure's outcome, see Brew Aff., Ex. 21 (journal article written by defendant about procedure prior to plaintiff's operation stating that "followup reports are [based on short observation times] but we believe results indicate that further trial of this new procedure is deserved."), and went on to write additional articles about the procedure, see id. Ex. 22 (journal article written by defendant after plaintiff's operation

17

reporting on her outcome noting that "[c]areful followup evaluation is now available on more patients and for a longer period"), Ex. 23 (journal article reporting plaintiff's outcome describing itself as a "retrospective 10 to 22-year followup study"). The ongoing nature of the physician-patient relationship is demonstrated by the fact that Leadbetter continued to publish articles about the plaintiff a decade after he last treated her as a patient, see Brew Aff., Ex. 23 (1985 journal article written by defendant after plaintiff's operation reporting on her outcome), and the fact that Leadbetter personally treated the plaintiff at least three times after he performed the Leadbetter procedure, see Brew Aff. ¶ 4 (treatment for which plaintiff has not yet received medical records), Ex. 14 (12/17/73 medical record showing treatment by Leadbetter), Ex. 18 (7/14/75 medical record showing treatment by Leadbetter).

Other evidence shows that rather than performing all of the monitoring function himself, Leadbetter directed Ferraro's treatment, reaching into New Hampshire to do so by having Ferraro act as his agent. The plaintiff has produced numerous hospital records in which Ferraro, providing treatment to the plaintiff in New Hampshire, refers to Leadbetter and his suggestions for treatment. See Brew Aff., Exs. 7, 8, 9, 12, 13, 15, 16, 17, 19, 20 (plaintiff's hospital records prepared by Ferraro referring to

18

Leadbetter despite the fact that Ferraro treated the plaintiff). This evidence is sufficient to raise a reasonable inference that Leadbetter was directing Ferraro's treatment of the plaintiff in New Hampshire. Based on this evidence, which has not been controverted, the court makes a preliminary finding that Ferraro was acting as Leadbetter's agent. Thus, it is not only Leadbetter's personal contacts with New Hampshire but also Ferraro's contacts attributable to Leadbetter that are relevant to the court's minimum contacts analysis. See Kennedy, 526 F. Supp. at 1329 n.1; Soares, 417 F. Supp. at 307; see also Salpoglou, 899 F. Supp. at 838.

Ferraro's forum-related conduct attributable to Leadbetter for minimum contacts analysis includes: continued monitoring of the plaintiff after the experimental Leadbetter surgery; the administration, in New Hampshire, of treatments recommended by Leadbetter; and, an ongoing failure to disclose to the plaintiff the cause of her continued medical difficulty.[7] The court now

_____

[7]Leadbetter is not subject to general personal jurisdiction in New Hampshire because of his association with Ferraro, a New Hampshire resident presumably subject to general jurisdiction here. It is Ferraro's conduct in New Hampshire related to the agency relationship, not all his New Hampshire conduct, that is relevant to the court's analysis. For that reason, the negligent surgery performed by Ferraro is not attributable to Leadbetter as a relevant contact because it happened before the creation of the principal-agent relationship, but Ferraro's ongoing acts of concealing that negligence are attributable to Leadbetter.

19

considers the added effect of this additional conduct on the minimum contacts analysis of relatedness, purposeful availment, and the gestalt factors established by Leadbetter's contacts alone.

Although Leadbetter's personal contacts with New Hampshire are only slightly related to the plaintiff's cause of action, the Leadbetter-Ferraro contacts are more directly related. By performing the procedure on the plaintiff, Leadbetter began what he knew or should have known would be a continuing relationship with the plaintiff requiring years of monitoring and follow-up treatment, in which Ferraro was actively engaged as Leadbetter's New Hampshire agent. Thus, it appears that the Leadbetter-Ferraro treatment of the plaintiff was not a series of isolated and unconnected incidents, but a single, related program of treatment. It follows that the Leadbetter-Ferraro treatment of the plaintiff and their ongoing failure to disclose information to her gave birth to her cause of action in a way that Leadbetter's isolated contacts with New Hampshire did not. The court finds the Leadbetter-Ferraro contacts to be related to the plaintiff's cause of action.

Similarly, although Leadbetter's personal contacts with New Hampshire amount only to a slight showing of purposeful availment, the Leadbetter-Ferraro contacts support a stronger

showing of purposeful availment.  The evidence produced by the plaintiff indicates that Leadbetter accepted as a patient for an experimental surgery a New Hampshire resident who he knew would require years of monitoring.  By accepting the plaintiff as a patient and selecting Ferraro to act as an agent to provide treatment in New Hampshire, Leadbetter purposefully availed himself of the New Hampshire forum.  His actions make it foreseeable that he would be subject to suit here.  The court finds that the Leadbetter-Ferraro contacts demonstrate purposeful availment of the New Hampshire forum.

Although the gestalt factors based on Leadbetter's personal contacts point moderately in favor of the exercise of personal jurisdiction, the Leadbetter-Ferraro contacts point more strongly in favor of the exercise of personal jurisdiction.  Inclusion of Ferraro's contacts leaves the analysis of gestalt factors one, three, and four, which already point toward the exercise of jurisdiction, unchanged.  However, it influences factors two and five.  When a doctor in one state acts as the agent of a doctor in another state, the concern for threatening the availability of out-of-state medical care for residents disappears.  Under those circumstances, doctors can be assured that they will not be haled into court merely because they provided medical treatment to an out of state patient, so long as they do not reach into that

21

patient's state to provide continued medical care, either in person or through an agent.  Accordingly, the court finds that gestalt factors two and five point in favor of the exercise of personal jurisdiction.

Based on the Leadbetter-Ferraro contacts, the court finds that the gestalt factors taken together indicate that the exercise of jurisdiction in this case would not violate notions of fundamental fairness.  In addition, considering the showings of relatedness and purposeful availment as bolstered by the gestalt factors, the court finds that the plaintiff has produced sufficient evidence that the court may constitutionally exercise personal jurisdiction over Leadbetter.[8]

_____

[8]The court's finding of jurisdiction is provisional -- the court will be unable to exercise personal jurisdiction over Leadbetter unless development of the factual record provides support for her agency theory or yields other facts justifying the exercise of personal jurisdiction.  See Boit, 967 F.2d at 675.

<u>Conclusion</u>

Leadbetter's motion to dismiss the case for lack of personal jurisdiction (document no. 19) is denied.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
Chief Judge

October 16, 1996

cc:  William D. Pandolph, Esquire
     Ronald L. Snow, Esquire
     John Friberg, Esquire
     Michael Callahan, Esquire
     John Traficonte, Esquire
     Robert Backus, Esquire